# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| BACUS LABORATORIES, INC. | ) | Civil Action No. 02 CV 9073 |
| | ) | Consolidated with No. 03 CV 2352 |
| Plaintiff, | ) | |
| | ) | The Honorable Matthew F. Kennelly |
| v. | ) | |
| | ) | Magistrate Judge Ian H. Levin |
| APERIO TECHNOLOGIES, INC. and | ) | |
| DAKOCYTOMATION CALIFORNIA, INC. d/b/a | ) | |
| DAKO CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

**DOCKETED**

**JUL 2 7 2004**

## PLAINTIFF'S PROFFERED CONSTRUCTION
## OF DISPUTED TERMS OF THE CLAIMS IN ISSUE IN THIS ACTION

FILED

JUL 2 3 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## TABLE OF CONTENTS

PAGE NO.

I. THE PARTIES AND THEIR PRODUCTS ........................................................ 1

  A. Bacus ......................................................................................................... 1

  B. Aperio ....................................................................................................... 4

II. The Patents-In-Suit ......................................................................................... 5

III. THE DISCLOSED INVENTIONS OF THE PATENTS IN SUIT ...................... 5

  A. The '235 Patent, the '774 Patent and the '941 Patent .......................... 5

IV. THE MEANING AND SCOPE OF THE CLAIMS OF THE PATENTS ........... 7

  A. The Applicable Law Regarding Claim Construction ............................ 7

V. CLAIM PHRASES OF THE '235 PATENT REQUIRING CONSTRUCTION ... 9

  A. Claim 1 Of The '235 Patent .................................................................. 10

    1. The phrase "image tiles" .............................................................. 10

    2. The phrase "digitally scanning" .................................................. 12

    3. The phrase "data structure of images" ....................................... 12

  B. Claim 3 Of The '235 Patent .................................................................. 13

    1. The phrase "a portion of the specimen" ..................................... 13

    2. The phrases "an overall macro view" and "said overall macro view" .......... 13

    3. The term "marker" ....................................................................... 14

  C. Claim 23 Of The '235 Patent ................................................................ 14

    1. The phrase "multiple tiled images" ............................................ 15

  D. Claim 33 Of The '235 Patent ................................................................ 15

    1. The phrase "virtual microscope slides" ...................................... 15

    2. The phrase "original optical image" ........................................... 16

i

E.   Claim 59 Of The '235 Patent ............................................................................ 16

    1.   The phrase "contiguous fields of view" .................................................... 17

    2.   The phrase "edge alignment data" ............................................................ 17

    3.   The phrase "reconstructing contiguous images" ...................................... 18

VI.   CLAIM PHRASES OF THE '774 PATENT REQUIRING CONSTRUCTION .................................. 18

A.   Claim 1 Of The '774 Patent ............................................................................... 18

    1.   The phrase "original microscope images" ................................................ 19

    2.   The term "viewer" ...................................................................................... 19

B.   Claim 14 Of The '774 Patent ............................................................................. 19

    1.   The phrase "mapping coordinates" ........................................................... 20

VII.   CLAIM PHRASES OF THE '941 PATENT REQUIRING CONSTRUCTION ................................. 20

A.   Claim 1 Of The '941 Patent ............................................................................... 20

    1.   The phrase "control information" .............................................................. 21

B.   Claim 3 Of The '941 Patent ............................................................................... 21

    1.   The term "zooming" ................................................................................... 22

C.   Claim 64 Of The '941 Patent ............................................................................. 22

    1.   The phrase "slide tray information" .......................................................... 22

## TABLE OF AUTHORITIES

PAGE NO.

### CASES

*Ballard Med. Prods. v. Allegiance Healthcare Corp.,*
    268 F.3d 1352 (Fed. Cir. 2001) ........................................................................ 9

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.,*
    320 F.3d 1339 (Fed. Cir. 2003) ...................................................................... 9

*Cybor Corp. v. FASTechs, Inc.,*
    138 F.3d 1448 (Fed. Cir. 1998)(en banc) .................................................... 7

*Digital Biometrics, Inc. v. Identix, Inc.,*
    149 F.3d 1335 (Fed. Cir. 1998) ...................................................................... 7

*Gart v. Logitech, Inc.,*
    254 F.3d 1334 (Fed. Cir. 2001) ...................................................................... 7

*Insituform Techs., Inc. v. Cat Contracting, Inc.,*
    161 F.3d 688 (Fed. Cir. 1998) ........................................................................ 7

*Interactive Gift Express, Inc. v. Compuserve, Inc.,*
    256 F.3d 1323 (Fed. Cir. 2001) ...................................................................... 8

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967 (Fed. Cir. 1995)(en banc),
    *aff'd,* 517 U.S. 370 (1996) .............................................................................. 7

*Middleton, Inc. v. Minnesota Mining & Mfg. Co.,*
    311 F.3d 1384 (Fed. Cir. 2002) ...................................................................... 9

*Omega Eng'g, Inc. v. Raytek Corp.,*
    334 F.3d 1314 (Fed. Cir. 2003). .................................................................... 9

*Teleflex, Inc. v. Ficosa N. Am. Corp.,*
    299 F.3d 1313 (Fed. Cir. 2002) ...................................................................... 9

*Texas Digital Sys., Inc. v. Telegenix, Inc.,*
    308 F.3d 1193 (Fed. Cir. 2002) ...................................................................... 8

*U.S. Surgical Corp. v. Ethicon, Inc.,*
    103 F.3d 1554 (Fed. Cir. 1997) ...................................................................... 7

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ................................................................... 7, 8

*Vivid Technology, Inc. v. American Sci. & Eng'g. Inc.*,
   200 F.3d 795 (Fed. Cir. 1999). .................................................................. 9

## STATUTES

35 U.S.C. § 112 .............................................................................................. 8

which comprises an overall magnified image of a small specimen such as tissue, cells, blood cells or the like along with addressable multiple higher magnification images of specific areas or points on a specimen. As discussed in the patents in suit, the virtual microscope slide can replace glass slides having actual specimens thereon, and in many instances, eliminate the need for an actual microscope with different magnifying lenses to view magnified images of the actual specimen. For instance, Bacus has a web site on which are stored virtual slides that can be accessed by students using their personal computers and monitors for study in medical, dental and teaching fields without the students using the actual glass slides and microscopes to view points on the specimens. Similarly, certification testing of pathologists is now being done using virtual microscope slides prepared by Bacus rather than actual microscopes and actual glass slides which have been used heretofore in testing the knowledge of pathologists prior to their certification.

Bacus manufactures and sells a digital microscope instrument under the trademark **BLISS** for scanning the specimen(s) on a microscope slide to obtain magnified image data useable to provide an overall, low magnification image of the entire specimen and to provide multiple higher resolution images at several higher magnifications of points or areas within the specimen. Bacus also sells or provides a leasing of an Internet server under the trademark **WebSlide** server which will provide an organized collection of digitized microscope slides to be rapidly accessed across an Internet or intranet network.

Bacus also sells or leases browser software programs for use with personal computers for viewing the virtual microscope slides that allow the viewer to navigate within an overall image and to select a point, as by using a mouse, to view at each of several multiple magnifications, e.g., a 10X, 20X or 40X magnification. This software allows the user to flip back and forth between different magnifications in the manner of zooming, for example, from a 10X

magnification image of a point to a 20X magnification image of the point, and then a 40X magnification image of the point without switching objective lens as in a microscope. Further, in such zooming, the mouse cursor will mark the point on the overall image on the viewing screen unlike an actual microscope where there is no curser mark on the specimen, and the user must remember the location on the actual specimen at which the successively viewed images are located. Also, these Bacus viewer software programs allow the viewer to scroll or pan into view any adjacent area or point on the specimen without a repositioning of a microscope stage carrying the specimen as would be done using an actual microscope. These Bacus viewer software programs are marketed under the names WebSlide Browser, Active X Net Viewer and Java Net Viewer.

Another Bacus product is a tissue microarray virtual microscope slide using a Bacus software program called Tracer. Typically, a tissue microarray slide has two hundred to a thousand small circular specimens (often called "dots") arranged in rows and columns on a single microscope slide. Often, the samples are from many different patients or are many different kinds of specimen samples. The Tracer software program automates the high resolution image capture of these 200 to 1,000 specimen dots to overcome what would be a very slow, tedious, error-prone process, if done manually, by an operator. Additionally, the Tracer software program indexes the dots by their respective row and column locations for later retrieval, which was not available heretofore. The dots themselves or points thereon can be viewed at multiple high magnifications.

The virtual microscope slides have magnified images of such quality, i.e., high resolution, that they can be analyzed for remote pathology consultation and for quantification of characteristics of cells and tissues. Bacus sells or leases morphometric and/or immunohistochemistry quantitative measurement software programs for use with the virtual

microscope slide images. More specifically, Bacus markets such quantitative measurement software products under the names: TMA score, Histology Grade, Cell Finder, Cell View, Nuclear Grade and Mitotic Count.

Other Bacus products are slide collections comprised of virtual microscope slides directed to a specific course of study such as Cell Biology, Histology (a virtual slide collection used in first year medical, dental and veterinary education courses); Pathology of Disease (a virtual slide collection used in second year medical education courses); and Oral Pathology (a virtual slide collection used in second year medical and dental education courses).

**B. Aperio**

Aperio Technologies is a California corporation with a principal place of business in Vista, California. Dakocytomation is a California corporation with a principal place of business in Carpinteria, California. Until very recently, Dako was a partner of Aperio Technologies and sold the accused products and services of Aperio Technologies.

Aperio makes, uses, offers to sell, and/or sells various combinations of virtual microscopy products, the use or practice of which Bacus contends infringe the patents-in-suit. These products include the ScanScope Instruments, the ScanScope T108, the ScanScope T2, CPUs of scanners, the ScanScope Controller software, the ScanScope Console software, the ImageCompressor software, ImageBatcher software, servers with Web Viewer software (sometimes referred to in Aperio's documents as the Web Server software), Virtual Slide Repositories, Virtual Slide Viewing Stations, Annotation Creation "Plug-In" for ImageScope, Tissue Microarray Analysis (TMA) software, Multi-user Virtual Microscopy software, and ScanScope Manager software.

4

Aperio also provides ScanScope.com and TMALab services. The ScanScope.com and TMALab services both use slides created and viewed with the ScanScope system, Web Viewer server software, and TMALab software.

## II. THE PATENTS-IN-SUIT

The '235 patent was filed on February 27, 1998 as a continuation-in-part patent application No. 08/805,856, filed on March 3, 1997, now Patent No. 6,101,265, and issued on August 7, 2001. The '941 patent was filed on June 12, 2000 as a continuation-in-part patent application No. 09/032,314, filed on February 27, 1998, which is a continuation-in-part of application No. 08/805,856 filed on March 3, 1997, now Patent No. 6,101,265, which is a continuation-in-part of application No. 08/701,974 filed on August 23, 1996, now Patent No. 6,031,930, and issued on May 28, 2002. The '774 patent was filed on May 19, 2000 as a division of application NO. 09/032,514 filed on February 27, 1998, now the '235 patent and issued on February 18, 2003.

## III. THE DISCLOSED INVENTIONS OF THE PATENTS IN SUIT

### A. The '235 Patent, the '774 Patent and the '941 Patent



5

The patents disclose a new and improved method and apparatus for constructing digitally scanned images from a slide specimen 13A, for storing the digitally scanned images in a tiled format convenient for viewing without a microscope, and for transferring the tiled images for viewing by another at a remote location. The disclosed apparatus includes a microscope with a platform or stage 11 for supporting a microscope slide. A specimen to be scanned is placed on the slide, and the slide is placed on the stage 11.

In the disclosed embodiment, the entire image of the specimen 13A is scanned by the microscope in multiple individual images capturing multiple, contiguous fields of view. The stage moves in increments approximating the field of view.

In the disclosed embodiment, an optical array sensor 19 captures the scanned images, converts the image into digital signals, and sends the digital signals to the computer 32. The computer stores the digital information representing the scanned image, include the x-y coordinates of each individual scanned image of a portion of the specimen. Each of the pixel locations in each such individual scanned image is stored in a bit-mapped file which stores the pixel layout for each such individual image.

In the disclosed embodiment, to display an image of a selected area of the specimen, the computer 32 calculates the appropriate tiles needed to display that selected area. The computer, using the x-y coordinate information, determines the identity of the contiguous portions ("tiles" or "tiled images") of the selected area and displays those portions to display the selected area.

When accessing the computer through an Internet or intranet, a user may interactively select only those diagnostically significant areas of the specimen for viewing. The data can be transmitted to allow multiple users to view the virtual images of the specimen.

6

## IV.  THE MEANING AND SCOPE OF THE CLAIMS OF THE PATENTS

The determination of patent infringement is a two-step process: (1) determining the meaning and scope of the claims, and (2) comparing the properly construed claims to the accused device. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)(en banc), *aff'd*, 517 U.S. 370 (1996). Claim construction is a matter of law. *Cybor Corp. v. FASTechs, Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc). A determination of infringement, both literal and under the doctrine of equivalents, is a question of fact. *Insituform Techs., Inc. v. Cat Contracting, Inc.*, 161 F.3d 688, 692 (Fed. Cir. 1998).

### A.  The Applicable Law Regarding Claim Construction

The object of claim construction is to determine what sometimes terse or unfamiliar words in patent claims mean. *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001); *Markman v. Westview Instr., Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The claims of a patent serve a public notice function by defining and limiting the patentee's statutory right to exclude. *Markman*, 52 F.3d at 987. The exercise of judicial claim construction serves to aid the fact finder in understanding the scope of the patent:

> Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.

*U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).

The primary sources to be consulted when construing a patent claim are:  (i) the language of the claim, (ii) the patent's specification, and (iii) the prosecution history of the patent. *Gart*, 254 F.3d at 1340; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996); *Markman*, 52 F.3d at 979-80. These sources are called the "intrinsic evidence," as they are public record available for all to consult when determining the meaning and scope of a patent claim.

7

When the intrinsic evidence unambiguously describes the scope of a patented invention, reliance on "extrinsic evidence," such as expert testimony, is improper. *Vitronics*, 90 F.3d at 1583; *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998). A court may receive extrinsic evidence to educate itself about the invention and the relevant technology; although it may not use extrinsic evidence to arrive at a claim construction that is "clearly at odds with the construction mandated by the intrinsic evidence." *Vitronics*, 90 F.3d at 1583-84. Here, Bacus believes that the intrinsic evidence alone resolves the construction of the disputed claim terms and that consideration of extrinsic evidence is improper. However, Bacus reserves the right to supplement this proposed claim construction if this Court determines that it wishes to consider extrinsic evidence. In assessing the intrinsic evidence, the Court should be construed to rely upon the following hierarchy of analytical tools: the actual words of the claims (as used in their ordinary, relevant dictionary meaning), the patent specification, and the prosecution history.

"In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is the language that the patentee chose to use to particularly point out and distinctly claim the subject matter which the patentee regards as his invention. 35 U.S.C. § 112, ¶ 2." *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1201 (Fed. Cir. 2002) (quoting *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001)). The terms used in the claims bear a "heavy presumption" that they mean what they say and have the ordinary meaning that would be attributed to those terms by persons skilled in the art. *Id.*

In determining the ordinary meaning of claim terms, the Court may freely consult publicly-available dictionaries, encyclopedias, or treatises as objective and reliable sources that indicate the meaning attributable to the claim terms by those of skill in the art. *Texas Digital*

8

*Sys., Id.* at 1202-3 (Fed. Cir. 2002). These resources are often considered the most meaningful in determining the ordinary meaning of claim terms. *Id.* at 1203.

A patent applicant may overcome the heavy presumption of ordinary meaning by clearly using a word in the specification, prosecution history, or both "in a matter inconsistent with its ordinary meaning." *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1347 (Fed. Cir. 2003). In other words, a patent applicant may consistently and clearly use a term in a manner either more or less expansive than its general usage in the relevant community, and thus expand or limit the scope of the term in the context of the patent claims. *Middleton, Inc. v. Minnesota Mining & Mfg. Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002) (explaining that in order to disavow claim scope, a patent applicant must clearly and unambiguously express surrender of subject matter during prosecution); *Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1361 (Fed. Cir. 2001) (noting that an applicant may disclaim claim scope during prosecution). Thus, the specification may limit the scope of a claim if the patentee has disavowed or disclaimed the scope by using words or "expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). Similarly, analogous to the careful use of the specification, the prosecution history may limit the scope of the claims if "the alleged disavowing actions or statements made during prosecution [are] both clear and unmistakable." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1326 (Fed. Cir. 2003).

## V. CLAIM PHRASES OF THE '235 PATENT REQUIRING CONSTRUCTION

Aperio disputes the meaning of certain terms in asserted independent method claim 1, its dependent method claim 3, independent apparatus claim 23, independent method claim 33, and independent method claim 59. Those terms are underlined in Ex. E.

Aperio does not dispute the meaning of terms in asserted independent claims 17 and 67 and dependent claims 10, 19, 39, 40, 41, 44, 62 and 68 and the other terms in asserted claims 1, 3, 23, 33 and 59 which were previously in dispute, as proffered by Bacus in its claim construction memorandum (Ex. B). Aperio agrees with many of Bacus' proposed claim constructions of the '235 patent. (See Ex. E.)

## A.    Claim 1 Of The '235 Patent

Independent method claim 1 is set out below with the disputed phrases highlighted:

1.  A method of constructing and using a <u>data structure of images</u> from a specimen on a microscope slide using a microscope having an objective lens comprising:

<u>digitally scanning</u> and storing images from the specimen on a microscope slide to create a plurality of individual contiguous <u>image tiles</u> at a resolution finer than the optical resolution of the objective lens of the microscope and with a digital spacing between pixels finer than the optical resolution of the objective lens;

providing a control program for the data structure for viewing, manipulating and reconstructing the image tiles; and

transferring the scanned, digital image tiles over an Internet or intranet communication channel; and

using the control program to allow viewing of a digital reconstructed composite image formed from contiguous image tiles of a substantially larger image area than the area of the individually acquired tiles.

### 1.    The phrase "image tiles"

As is demonstrated below, the disputed phrase "image tiles" should be construed to mean: "sub-sections or parts of an image" where "image" means "an optical representation."

According to a relevant dictionary,[3] a "tile" is a "sub-section or part of a larger bit-mapped image." (DPDI, Ex. 9, p. 337)

---

[3]  Relevant dictionary definitions are taken from the following sources: THE AMERICAN HERITAGE RELEVANT DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. Houghton Mifflin Company 2000) (Am. Heritage)(excerpts attached as Ex. 8); Tom Ang, RELEVANT DICTIONARY OF PHOTOGRAPHY AND DIGITAL IMAGING (Amphoto Books 2002, copyright 2001) (DPDI)(excerpts attached Ex. 9); Ex. 10; McGRAW-HILL RELEVANT DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS (Sybil P. Parker ed., 5th ed. McGraw-Hill, Inc. 1994) (McGraw-Hill)(excerpts attached as Ex. 11); MODERN DICTIONARY OF ELECTRONICS (6th ed. Howard W. Sam & Co., Inc. 1984) (MDE)(excerpts attached as Ex. 12). Only the most relevant definitions are included herein.

A relevant dictionary definition of the term "image" is "An optically formed duplicate, counterpart, or other representative reproduction of an object, especially an optical reproduction formed by a lens or mirror." (Am. Heritage, Ex. 8, p. 875) Another relevant dictionary definition of "image" is "Reproduction or representation of an object produced by light rays." (DPDI, Ex. 9, p. 180)

The usage of "image tiles" and "tile" in accordance with their ordinary meaning is supported by the specification of the '235 patent, where the terms are used many times and in a manner consistent with their meaning. See *e.g.*, the '235 patent, abstract ("The digitally scanned images are arranged in a tiled format convenient for viewing without a microscope, and for transferring the tiled images for viewing by another at a remote location."); '235 patent, column 2, lns. 8-13 ("The overall view was constructed by taking a large number of ... images of the specimen through a microscope scanning system and then coherently assembling and coordinating these respective smaller views or images (hereinafter "image tiles") into one coherent ... macro image from the specimen"); '235 patent, col. 5, lns. 7-12 ("problems with achieving tileable (i.e. contiguous images which can be seamlessly abutted next to each other to recreate the original image, but at different magnifications) multiple images of a specimen on a microscope slide are overcome by the system of the invention"); the '235 patent, col. 8, lns 55-63 ("The individual, sub-portions or tiles of the scanned image are seamed together....The scanned images are then stored in a series of contiguous image tiles"); and the '941 patent, col. 2, lns. 2-28 ("The tiles of the tiled images represent a field of view which may be captured from a microscope...The images are captured on a CCD array which generates images in color or black and white and stores them in a frame buffer or on disk in tiled format....All of the images are tiled and stored in digital format...Because the images have already been captured and coordinated in tiled form, it is unnecessary to provide a robotically-controlled microscope or

even the original specimens themselves....The client provides requests to the server indicating the portion which is desired to be viewed and the server supplies the appropriate tiles for that portion of the image. The tiles are received by the client and are assembled into a seamless view which may be scrolled through and scanned in the same manner as a pathologist may move about a microscope slide to find regions of interest.").

This construction is the ordinary meaning of the claim terms. There is no clear disavowal of claim scope within the '235 patent's specification or prosecution history regarding these terms or phrase.

### 2. The phrase "digitally scanning"

The disputed phrase "digitally scanning" should be construed to mean: "the successive analyzing according to a predetermined method of elements constituting a picture area in the form of digits."

The term "digital" means "pertaining to data in the form of digits" (McGraw Hill, Ex. 11, p. 572)

The relevant dictionary definition of the term "scanning" is "In television, facsimile, or picture transmission, the successive analyzing or synthesizing, according to predetermined method, of the light values or equivalent characteristics of elements constituting a picture area." (MDE, Ex. 12, p. 885)

This construction is the ordinary meaning of the claim terms. There is no clear disavowal of claim scope within the '235 patent's specification or prosecution history regarding these terms or phrase. See the abstract, 2:8-17, 4:18-24, and 4:32-36.

### 3. The phrase "data structure of images"

As demonstrated below, "data structure of images" should be construed to mean: "a collection of data components of images."

The relevant dictionary definition of "data structure" is "A collection of data components that are constructed in a regular and characteristic way." (McGraw-Hill, Ex. 11, p. 520)

There is no clear disavowal of claim scope within the '235 patent's specification or prosecution history regarding these terms or phrase. The phrase is used consistently with the definition in several instances. For example, the specification variously describes the data structure as including data from high and low magnifications of the specimen at 4:24-29 and 6:42.

**B.    Claim 3 Of The '235 Patent**

Claim 3 of the '235 patent is set out below with the terms in dispute highlighted:

3.  The method of claim 2 further comprising:
    displaying a first image comprising a portion of the specimen as an overall macro view;
    displaying a second image comprising higher resolution view from the specimen on the microscope slide at a higher magnification than the magnification of the overall macro view;
    selecting a point on said overall macro image with a marker; and
    producing a corresponding higher magnification image at the location of the marker.

**1.    The phrase "a portion of the specimen"**

As demonstrated below, the phrase "a portion of the specimen" should be construed to mean: "a section or part of the specimen."

The relevant dictionary definition of "portion" is "A section or quantity within a larger thing; a part of a whole." (Am. Heritage, Ex. 8, p. 1368)

The phrase "a portion of the specimen" is used consistently in the '235 patent specification with the definition in several instances, such as 1:33-38, 1:59-63, 8:55-59, 10:61-64, 11:3-11, 12:1-3, 19:38-43, and 25:28-32.

**2.    The phrases "an overall macro view" and "said overall macro view"**

As demonstrated below, the phrases "an overall macro view" and "said overall macro view" should be construed to mean: "a comprehensive large scale view."

13

The relevant dictionary definitions are as follows:

"Overall" is defined as: "Including everything; comprehensive." (Am. Heritage, Ex. 8, p. 1252)

"Macro" is defined as: "Large in scope or extent; large-scale: *a macro analysis of many reports.* (Am. Heritage, Ex. 8, p. 1048)

At least 2:1-2, 2:30-36, 3:12-16, 9:19-23, 11:7-11, and 12-18:21 of the '235 patent's specification demonstrate that the term macro is used throughout the patent in support of the above definition.

### 3. The term "marker"

As demonstrated below, the term "marker" should be construed to mean "something that locates a specific point or condition."

The relevant dictionary definitions are as follows:

"Marker" is defined as: "One that makes a mark." (Am. Heritage, Ex. 8, p. 1071)

"Mark" is defined as: "A character or feature in a file, record, or data stream used to locate a specific point or condition." (Am. Heritage, Ex. 8, p. 1071)

The term "marker" is used consistently with the definition in several instances such as in the abstract, 2:22-26, 2:30-36, 4:46-50, 8:13-19, and 26:32-37.

### C. Claim 23 Of The '235 Patent

Claim 23 of the '235 patent is set out below with the disputed terms highlighted:

23. An apparatus for creating and using a data structure comprising:
a computer-controlled microscope imaging system for digitally scanning <u>multiple tiled images</u> from an area of interest from a specimen on a microscope support at a first resolution and image magnification;
a program and a microscope stage and positioning system for shifting the stage for recording the scanned digital images in a series of contiguous image tiles at a resolution finer than the optical resolution of the objective lens of the microscope and with a digital spacing between pixels finer than the optical resolution of the objective lens; and
a program for linking the series of contiguous image tiles with a control program effective for viewing, manipulating and reconstructing the image tiles.

14

### 1.    The phrase "multiple tiled images"

The meaning of the phrase "multiple tiled images" should be construed to be "more than one portion of the image."

The relevant dictionary definition of the term "multiple" is "having, relating to, or consisting of more than one individual, element, part or other component; manifold."  (Am. Heritage, Ex. 8, p. 1155)

A "tiled image" should be construed to be "an image broken into parts."  See construction of "image tile" for claim 1.

### D.    Claim 33 Of The '235 Patent

Claim 33 of the '235 patent is set out below with the disputed terms highlighted:

33.  A method for viewing a portion of or an entire virtual microscope slide having a specimen representation comprised of sets of digitized image tiles, the method comprising:
    providing an Internet or intranet communication channel;
    providing one or more receivers connected to the Internet or intranet communication channel to receive <u>virtual microscope slides</u> for viewing;
    storing one or more sets of virtual microscope digital slides at a first station connected to the Internet or intranet communication channel;
    transmitting stored digital image tiles at a first resolution and magnification over the Internet or intranet communication channel to a receiver requesting a virtual microscope slide or a portion thereof; and
    providing <u>a display</u>[4] of a virtual microscope slide
    formed from the transmitted set of digital image tiles as a composite reconstructed view
    formed of selected contiguous image tiles at the first resolution and magnification of the <u>original optical image</u> and
    providing a display of an overall view of an area of interest of the specimen representation at a lower resolution and magnification at the requesting receiver.

### 1.    The phrase "virtual microscope slides"

The meaning of the phrase "virtual microscope slides" should be construed to be:

"microscope slides simulated or carried on by means of a computer."

---

[4] Aperio has recently indicated that it now agrees with Bacus' proposed construction of this term.

The relevant dictionary definition of "virtual" is: "created, simulated or carried on by means of a computer or computer network." (Am. Heritage, Ex. 8, p. 1593)

There is no clear disavowal of claim scope within the '235 patent specification or prosecution history regarding this phrase. The phrase is used consistently with the definition in several instances in the '235 patent specification such as: 7:20-43.

### 2. The phrase "original optical image"

The meaning of the phrase "original optical image" should be construed to be: "the visual source of the image of the specimen from which a copy, reproduction or translation is made."

The relevant dictionary definition of the term "original" is "being the source from which a copy, reproduction, or translation is made" and of the term "optical" is "of or relating to sight; visual." (Am. Heritage, Ex. 8, p. 1241)

There is no clear disavowal of claim scope within the '235 patent specification or prosecution history regarding this phrase. The phrase is used consistently with the definition in several instances in the '235 patent specification such as: 5:9-11, 5:45-53 and 11:41-43.

### E. Claim 59 Of The '235 Patent

Claim 59 of the '235 patent is set out below with the disputed terms highlighted:

59. A method of viewing of high resolution images from a specimen on a microscope slide comprising:

providing a medium with digitally stored images of <u>contiguous fields of view</u> of an area of interest larger then several contiguous fields of view;

providing high resolution images stored at a digital spacing between adjacent pixels in a specimen image plane being greater than the microscope objective lens optical resolution spacing to preserve the optical resolution for a reconstructed high resolution composite image;

providing <u>edge alignment data</u> for spatial reconstruction of contiguous fields of view into a reconstructed composite image larger than several contiguous fields of view; and

using a control program for viewing, manipulating and <u>reconstructing contiguous images</u> to form the reconstructed composite views with the preserved high resolution.

16

### 1. The phrase "contiguous fields of view"

The meaning of the phrase "contiguous fields of view" should be construed to mean "images rendered by a lens system of an optical instrument abutted without any substantial overlap."

The term "contiguous" is defined in the specification as "abutted without substantial overlap." '235 patent 27:55-59; '265 patent 10:16-25.

The relevant dictionary definition of the phrase "field of view" is "the usually circular area in which the image is rendered by the lens system of an optical instrument." (Am. Heritage, Ex. 8, p. 656)

There is no clear disavowal of claim scope within the '235 patent specification or prosecution history regarding this phrase. The phrase is used consistently with the definition in several instances such as at 12:64-67, 27:51-63 and in the prosecution history at Amendment B, pp. 17-20 and 22 (Ex. 13).

### 2. The phrase "edge alignment data"

The meaning of the phrase "edge alignment data" should be construed to mean "information for adjusting the intersections of two surfaces to produce a proper orientation."

The relevant dictionary definitions of the phrase terms are:

<u>Edge:</u>    the line of intersection of two surfaces. (Am. Heritage, Ex. 8, p. 568)

<u>Align:</u>    to adjust (parts of a mechanism, for example) to produce a proper relationship or orientation. (Am. Heritage, Ex. 8, p. 44)

<u>Data:</u>    numerical or other information represented in a form suitable for processing by computer. (Am. Heritage, Ex. 8, p. 463)

### 3. The phrase "reconstructing contiguous images"

The meaning of the phrase "reconstructing contiguous images" should be construed to mean "rebuilding images abutted without any substantial overlap."

The relevant dictionary definition of the term "reconstruct" is "to construct again; rebuild." (Am. Heritage, Ex. 8, p. 1461)

The meaning of the term "contiguous" is shown above in Section V. W. 2.

There is no clear disavowal of claim scope within the '235 patent specification or prosecution history regarding this phrase. The phrase is used consistently with the definition in several instances such as at 12:64-67, 27:51-63 and in the prosecution history at Amendment B, pp. 17-20 and 22 (Ex. 13).

## VI. CLAIM PHRASES OF THE '774 PATENT REQUIRING CONSTRUCTION

Certain of the terms in the asserted claims, which Aperio disputes, were interpreted above in connection with the '235 patent. Such terms should be given their same construction in the '774 patent claims. Aperio disputes the meaning of certain additional terms of asserted independent claims 1 and 14. There are no additional terms in asserted claims 3 and 28. Aperio does not dispute the meaning of the other previously disputed terms previously proffered by Bacus in claims 1, 3, 14 and 28. Aperio's agreement to Bacus' proffered claim construction is shown in Ex. E.

### A. Claim 1 Of The '774 Patent

Claim 1 of the '774 patent is set out below with the disputed terms highlighted:

1. A data structure of images taken from a specimen on a microscope slide comprising:
    a series of contiguous, multiple images at a first magnification stored and useable to create an overall view of several adjacent, <u>original microscope images</u> assembled together;
    the multiple images taken from at least a portion of a specimen on the slide; and
    the series of images providing a magnified image of the slide specimen to <u>a viewer</u>.

### 1. The phrase "original microscope images"

The meaning of the phrase "original microscope images" should be construed to mean "images from the microscope from which representations are made."

The relevant dictionary definition of the term "original" is "being the source from which a copy, reproduction or translation is made." (Am. Heritage, Ex. 8, p. 1241)

There is no clear disavowal of claim scope within the '774 patent specification or prosecution history regarding this phrase. The phrase is used consistently with the definition in several instances in the '235 patent specification such as in the abstract and at 5:9-11, 5:45-53 and 27:47-59.

### 2. The term "viewer"

The meaning of the term "viewer" should be construed to mean "the user of the data structure."

The relevant dictionary definition of the term "viewer" is "one that views, especially an onlooker or spectator." (Am. Heritage, Ex. 8, p. 1918)

There is no clear disavowal of claim scope within the '774 patent specification or prosecution history regarding this term. The term is used consistently with the definition in several instances such as: 4:29-32, 6:62-64 and 12:3-6.

### B. Claim 14 Of The '774 Patent

Claim 14 of the '774 patent is set out below with the disputed terms highlighted:

14. A storage medium having digitized images of a specimen on a microscope slide comprising:
   a storage medium;
   a series of contiguous, multiple images at a first magnification stored and useable to create an overall view of several adjacent, original microscope images assembled together;
   the first series of multiple images taken from at least a portion of a specimen on the slide; mapping coordinates for assembling the series of contiguous, multiple images stored on the storage medium; and
   the mapping coordinates and the series of images providing a magnified image of the slide specimen to a viewer.

19

### 1. The phrase "mapping coordinates"

The meaning of the phrase "mapping coordinates" should be construed to mean "numbers used to determine the position of objects relative to one another."

The relevant dictionary definition of the term "map" is "the correspondence of elements in one set to elements in the same set or another set." (Am. Heritage, Ex. 8, p. 1067)

The relevant dictionary definition of the term "coordinates" is "any of a set of two or more numbers used to determine the position of a point, line, curve or plane in a space of given dimension with respect to a system of lines or other fixed references." (Am. Heritage, Ex. 8, p. 404)

There is no clear disavowal of claim scope within the '774 patent specification or prosecution history regarding this phrase. The phrase is used consistently with the definition in several instances in the '235 patent specification such as: 4:32-36, 6:37-41 and 12:48-58.

## VII.  CLAIM PHRASES OF THE '941 PATENT REQUIRING CONSTRUCTION

Certain of the terms in the asserted claims, which Aperio disputes, were interpreted above or in connection with the '235 patent. Such terms should be given their same construction in the '941 patent claims. Aperio disputes the meaning of certain additional terms in asserted independent claims 1 and its dependent claim 3 and independent claims 29 and 64. (Ex. E.) Aperio does not contest the meaning of any additional terms in asserted claims 12, 30, 70, 87, 95 and 97. Aperio does not dispute the meaning of the other previously disputed terms proffered by Bacus in claims 1, 3, 12, 29, 30, 64, 70, 87, 95 and 97. Aperio agrees with certain of Bacus' proffered claim construction. (See Ex. E.)

### A.  Claim 1 Of The '941 Patent

Claim 1 of the '941 patent is set out below with the disputed terms highlighted:

1. A method for viewing virtual microscope slides comprised of sets of digitized tiled images over a common communication channel, the method comprising:

providing a transmitting station connected to the common communication channel and accessible by a number of remote receiving stations connected to the common communication channel;

storing a plurality of sets of virtual microscope, digitized slide images at the transmitting station;

transmitting <u>control information</u> to the requesting computer for use in aligning the transmitted sets of digitized tiled images to form a composite, coherent, seamless digitized, virtual microscope, slide image from a set of digitized tiled images;

displaying on a viewer at a remote receiving station a thumbnail view of a specimen or portion thereof on the virtual microscope slide;

displaying on the viewer at the remote receiving station an aligned set of digitized tiled images at a higher resolution than the resolution of the thumbnail view; and

zooming by the viewer back and forth between the thumbnail view and the higher resolution set of digitized tiled images.

### 1. The phrase "control information"

The meaning of the phrase "control information" should be construed to mean "processed, stored or transmitted data with the ability to manage or direct."

The relevant dictionary definition of the term "control" is "authority or ability to manage or direct." (Am. Heritage, Ex. 8, p. 400)

The relevant dictionary definition of the term "information" is "processed, stored or transmitted data." (Am. Heritage, Ex. 8, p. 899)

There is no clear disavowal of claim scope within the '941 patent specification or prosecution history regarding this phrase. The phrase is used consistently with the definition in several instances in the '941 patent specification such as: 11:59 to 12:6, 22:39-46 and 31:64 to 32:10.

### B. Claim 3 Of The '941 Patent

Claim 3 of the '941 patent is set out below with the disputed term highlighted:

3. A method in accordance with claim 2 [A method in accordance with claim 1 further comprising: providing a plurality of digitized tiled images each at a different resolution and each a higher resolution than the thumbnail view; and <u>zooming</u> back and forth between the plurality of higher resolution images as well as with the thumbnail image.] further comprising operating a magnification selector at the receiving station to change between the plurality of higher resolution images.

### 1. The term "zooming"

The meaning of the term "zooming" should be construed to mean "enlarging or reducing the size of an image."

The relevant dictionary definition of the term "zoom" is "to enlarge or reduce the size of an image in an optical system or electronic display." (McGraw-Hill, Ex. 11, p. 2193)

Zooming by switching among the plurality of images is implied in the language of claim 3 and supported by the specifications. There is no clear disavowal of claim scope within the '941 patent specification or prosecution history regarding this phrase. The phrase is used consistently with the definition in several instances in the specification of the '941 patent such as 33:7-27, 36:19-26, and 36:38-49.

### C. Claim 64 Of The '941 Patent

Claim 64 of the '941 patent is set out below with the disputed terms highlighted:

64. A method of using a filing structure for organizing virtual microscope slide images to be requested by and transmitted to a requester from a server at a server station over a common carrier, comprising:
    transmitting a request from a requester at requesting station to the server station;
    transmitting a slide tray request to the server station;
    transmitting slide tray information from the server station to the requesting station;
    displaying to the requester slide tray information comprising a list of virtual microscope slide names on a display device at the requesting station;
    selecting from the slide tray information a microscope slide name to cause an image request for the selected slide to be sent to the server station; and
transmitting from the server station a set of tiled digitized images comprising the slide specimen or a portion thereof for viewing on the display device at the requesting station.

### 1. The phrase "slide tray information"

The meaning of the phrase "slide tray information" should be construed to mean "data relating to a slide tray."

The relevant dictionary definition of the term "information" is "a collection of facts or data." (Am. Heritage, Ex. 8, p. 899)

22

The claim language is used differently in the specification from the ordinary meaning of the terms to the extent that the "slide tray" is not a physical receptacle. Instead, the "slide tray" as used in the specification is a virtual or computer based receptacle that stores and displays slide information. This definition is used consistently in several instances in the '941 patent specification such as seen in figures 25 and 26 at 31:25-40.

Date:   July 23, 2004

John F. Flannery
Karl R. Fink
Mark W. Hetzler
Michael G. Vranicar
Timothy R. Baumann
Nicholas T. Peters
FITCH, EVEN, TABIN & FLANNERY
120 South LaSalle Street, Suite 1600
Chicago, Illinois 60603-3406
(312) 577-7000

347326

*Attorneys for Plaintiff, Bacus Laboratories, Inc.*

23

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **PLAINTIFF'S PROFFERED CONSTRUCTION OF DISPUTED TERMS OF THE CLAIMS IN ISSUE IN THIS ACTION** was caused to be served as follows upon:

| *Via Electronic Mail* *and Overnight Courier* | *Via Electronic Mail* *and Overnight Carrier* |
|---|---|
| Anthony J. Dain, Esq. | Robert A. Carson, Esq. |
| Pattric J. Rawlins, Esq. | Shannon L. Clark, Esq. |
| PROCOPIO, CORY, HARGREAVES | GOULD & RATNER |
| & SAVITCH LLP | 222 North LaSalle Street, Eighth Floor |
| 530 B Street, Suite 2100 | Chicago, Illinois 60601 |
| San Diego, California 92101-4469 | Telephone: 312/236-3003 |
| Telephone: 619/238-1900 | Facsimile: 312/236-3241 |
| Facsimile: 619/235-0398 | |

Attorneys for Defendant, this 23rd day of July 2004.

*Attorney for Plaintiff Bacus Laboratories, Inc.*

24

# SEE CASE FILE FOR EXHIBITS